AMERICAN ARBITRATION ASSOCIATION

|  |  |
|---|---|
| JAMES LONGLEY, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | Case Number: |
| ) | |
| OPENEVIDENCE, INC., ) | |
| ) | |
| Respondent. ) | |

## DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

### Introduction

1.    Claimant James Longley brings this demand for arbitration against his former employer OpenEvidence, Inc. ("OpenEvidence" or the "Company") for breach of the stock option agreements between him and the Company.

### Parties

2.    Mr. Longley is an individual with a residential address at 14 Boardman Lane in Hamilton, Massachusetts.

3.    OpenEvidence is a corporation organized under the laws of Delaware with its principal place of business at 215 NW 24th Street, 3rd Floor, Miami, Florida. OpenEvidence provides an artificial intelligence "copilot" and medical information platform for healthcare professionals.

### The Arbitration Provision

4.    The Company issued to Mr. Longley an Offer Letter, dated May 8, 2025, a copy of which is filed herewith.

1

5.      The Offer Letter sets forth the terms and conditions of Mr. Longley's employment with the Company, including those concerning his compensation, the majority of which was to be paid in the form of stock options.  The Offer Letter provides that the "stock options are subject to the terms of the Company's equity plan and the Company's form of stock options agreement."

6.      The Company's equity plan, referenced in the Offer Letter, is its 2022 Stock Option and Grant Plan (the "Equity Plan").  A copy of the Equity Plan is filed herewith.

7.      During the course of his employment with OpenEvidence, the Company made five grants of stock options to him. Each grant was made pursuant to a stock options agreement titled "Incentive Stock Option Agreement Under The OpenEvidence Inc. 2022 Stock Option and Grant Plan" (each, an "Option Agreement" and collectively, the "Option Agreements").  A form of an Option Agreement is filed herewith.

8.      Each Option Agreement contains a dispute resolution clause, at section 7, which provides, in part:  "[A]ny dispute arising out of or relating to the [Equity] Plan or this Stock Option, this Agreement, or the breach, termination or validity of the Plan, this Stock Option or this Agreement, shall be finally settled by binding arbitration conducted expeditiously in accordance with the J.A.M.S/Endispute Comprehensive Arbitration Rules and Procedures …. The place of arbitration shall be Delaware."

## Facts

9.      Mr. Longley began working for OpenEvidence, in a senior sales position titled "SVP, Commercial," on May 8, 2025. He left a lucrative position at his existing employer to do so, based primarily on the promise of significant stock options and his belief that OpenEvidence's stock price would grow substantially.  Mr. Longley was so bullish on the Company's prospects that he negotiated the entirety of his $2.2 million base salary to take the form of stock options.

2

10.     At the outset of his employment with OpenEvidence, Mr. Longley served in a direct sales role, with responsibility for making sales of media and data programs to pharmaceutical companies. Soon thereafter, Jeffrey Eaton, who then also held the title of "SVP, Commercial," suggested to Mr. Longley that he focus on larger enterprise sales opportunities, while serving in an "air cover" role to introduce the junior representatives to clients. Mr. Eaton and Mr. Longley agreed that this revised role would be sensible because OpenEvidence had hired and was continuing to hire more junior sales personnel, and also because Mr. Longley had strong relationships at the most senior levels of these pharma companies.  Mr. Eaton and Mr. Longley presented this suggestion to the Company's co-founder and CEO Daniel Nadler, who approved it. Approximately one month later, Mr. Eaton's title changed to "Head of Commercial," and as such, he became Mr. Longley's direct supervisor.

11.     Mr. Longley made significant achievements and progress in this revised role. As noted in his Offer Letter, the 2025 plan for the Company's commercial group, in which Mr. Longley served as a senior vice president, targeted $30 million in sales. In fact, through the efforts of Mr. Longley and team members, the Company realized over $100 million in sales during the period from 2025 to early 2026. Nearly every major account under Mr. Longley's leadership exceeded predetermined targets. Mr. Longley drove more than $6 million in AstraZeneca business, landed a $15 million GoodRx deal, secured Pfizer vendor approval in approximately five months despite similar processes taking years at competitors, and spent hundreds of hours advancing OpenEvidence through Merck's notoriously difficult approval process, ultimately securing the first approved Merck program shortly before his termination.

12.     Certain of the stock options were granted to Mr. Longley, pursuant to the compensation terms of his Offer Letter, because he had exceeded sales goals set forth in that

contract.

13.     Despite these achievements, Mr. Eaton told Mr. Longley that Mr. Nadler was concerned about the Company's "ROI" (return on investment) in him.  Mr. Eaton advised Mr. Longley to focus on landing a big sale in order to allay Mr. Nadler's concerns. For instance, in a January 27, 2026 text thread, Mr. Eaton told Mr. Longley, "I think if I were you I'd make it my goal in the next 2 months to find a $5m plus deal w pharma. You need to land your [whale image]." Mr. Eaton emphasized, "Nothing wrong but can vault you into the stratosphere you are always in." Also, on March 3, 2026, Mr. Longley texted to Mr. Eaton, "I think we need to start saying that I am directly selling it to the accounts when Daniel asks. I think that's a crucial thing for him to understand. [M]y role here is less about management and more about selling the big deal." Mr. Eaton responded, "Frankly we have and the 'big deal' hasn't happened yet. … The big deal has to happen but until then it's an update on slack to him." He added, "I know you've made impact, at our levels there are very high expectations. I'm excited for your March. Let's deliver there." Neither Mr. Eaton, nor anyone else at OpenEvidence, had ever stated or suggested to Mr. Longley that the Company might have "Cause" to terminate his employment.

14.     On Saturday, March 7, Mr. Longley was driving home from his son's basketball game, accompanied by his son and other players, when he received a call from Mr. Eaton. Mr. Eaton said, "It's not good news."  Mr. Longley told him he would call him back when he was alone, which he did.  During the second call, Mr. Eaton said, "We aren't colleagues anymore."  As an explanation for this abrupt firing, Mr. Eaton said that the ROI for Mr. Longley's position was not sufficient.  Mr. Eaton never said that Mr. Longley had done anything wrong or that OpenEvidence was letting him go for "Cause."  Also significantly, Mr. Longley was scheduled to vest in a portion of one of his stock options on the next day, March 8.

15.     By unceremoniously firing Mr. Longley only nine months after he joined the Company, OpenEvidence frustrated his ability to see many of the deals he had initiated come to fruition, and to earn resulting commissions.  On information and belief, several of those deals were completed after he was fired, resulting in substantial revenue for the Company.

16.     As a testament to his achievements, Mr. Longley has the highest degree of respect from the clients he has cultivated. For instance, on March 12, 2026, upon learning of his departure from the Company, an executive at a top client company texted to him: "I can't wrap my brain around that and I'm hoping it isn't true. You were the primary reason for the growth at OE and we all loved working with you, especially me."

17.     On March 15, 2026, the Company's Chief Commercial Officer James Esdaile sent an email to Mr. Longley, attaching a letter from him to Mr. Longley.  In the email, Mr. Esdaile wrote, "As Jeff noted during your phone conversation last week, your employment has been terminated for cause."  Mr. Eaton, as stated above, made no such statement, nor did he identify any grounds for a for-Cause termination. Mr. Esdaile's email and letter revealed the reason why the Company was now asserting that it had "Cause" to fire Mr. Longley. Based on its false assertion that it had Cause to fire Mr. Longley, the Company canceled all of the stock options he had earned.

18.     Each Option Agreement provides that, "if the Optionee's Service Relationship is terminated for Cause, this Stock Option shall terminate immediately upon the date of such termination."  *See* Option Agreement, § 1(c)(ii).  The term "Cause," as used in the Option Agreements, is defined in the Equity Plan. *See* Equity Plan, § 1, p.1.

19.     In correspondence from its counsel following Mr. Longley's firing, OpenEvidence invoked two prongs of the "Cause" standard set forth in the Equity Plan: prong (iv), specifically,

"willful misconduct or insubordination;" and prong (v), specifically, a "material violation" of agreements relating to "nondisclosure." In that same correspondence, OpenEvidence cited eight alleged instances of conduct that it claims to have warranted a for-Cause termination. None of the alleged instances of conduct, whether considered individually or collectively, satisfies either of the prongs invoked by the Company.

20.     As referenced above, the evidence shows that OpenEvidence fired Mr. Longley because the Company's leadership believed that his ROI was not sufficient to support his continued employment.  This does not constitute "Cause" for termination.

21.     Mr. Longley was vested in options to buy 59,998 shares of the Company's stock before the Company ever asserted it had "Cause" to let him go.  These options, which Mr. Longley was entitled to exercise before they were stripped from him, had value in the multiple millions of dollars in light of the spread between the strike price and the share price of OpenEvidence stock at the time.  On information and belief, the price of OpenEvidence's stock has continued to increase since Mr. Longley's firing, meaning his damages are increasing.

### Count for Breach of the Stock Option Agreements

22.     The allegations of the preceding paragraphs are incorporated herein by reference.

23.     OpenEvidence issued stock options to Mr. Longley during the course of his employment in five grants, referenced as ES-114, ES-129, ES-204, ES-240, and ES-241.  Each grant was made pursuant to his Offer Letter, an Option Agreement, and the Equity Plan.

24.     As referenced above, Mr. Longley was vested in options to buy 59,998 shares of the Company's stock.

25.    The Company breached the Option Agreements by canceling all of Mr. Longley's vested options where it did not have "Cause," within the meaning of the Equity Plan, to terminate his employment.

26.    Mr. Longley has sustained substantial damages as a result of OpenEvidence's above-referenced breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Longley respectfully requests that the Arbitrator:

(a)    award Mr. Longley an amount of money damages sufficient to provide him with the benefit of the bargain to which he is entitled under the Option Agreements. i.e., award Mr. Longley his expectancy damages;

(b)    in the alternative, order the Company to (i) specifically perform its obligations under the Option Agreements by, among other things, reinstating the stock options wrongfully canceled by the Company, (ii) make a gross-up payment sufficient to compensate Mr. Longley for any incremental tax liability incurred upon exercise of the reinstated options beyond what he would have owed had the options been exercised within the period prescribed by the Option Agreements, and (iii) make a payment for any additional damages incurred by Mr. Longley as a result of the Company's breach of the Option Agreements;

(c)    award Mr. Longley the attorneys' fees he incurs in connection with this arbitration;

(d)    award Mr. Longley the costs and expenses he incurs in connection with this arbitration;

(e)    award Mr. Longley interest at the statutory rate; and

(f)    grant Mr. Longley such further relief as the Arbitrator deems just and equitable.

JAMES LONGLEY

By his attorneys,

_____
Frank N. Gaeta (BBO No. 561388)
 fgaeta@richmaylaw.com
RICH MAY, P.C.
176 Federal Street
Boston, MA  02110
(617) 556-3800


Dated:  June 15, 2026

8